# Matter of Michael Vernon THOMAS, Respondent
# Matter of Joseph Lloyd THOMPSON, Respondent

*Decided by Attorney General October 25, 2019*

U.S. Department of Justice
Office of the Attorney General

(1) The tests set forth in *Matter of Cota-Vargas, Matter of Song, and Matter of Estrada* will no longer govern the effect of state-court orders that modify, clarify, or otherwise alter a criminal alien's sentence.

(2) Such state-court orders will be given effect for immigration purposes only if based on a procedural or substantive defect in the underlying criminal proceeding; these orders will have no effect for immigration purposes if based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or the avoidance of immigration consequences.

## BEFORE THE ATTORNEY GENERAL

On May 28, 2019, I directed the Board of Immigration Appeals ("Board") to refer this case for my review and invited the parties and interested amici to submit briefs addressing relevant questions. *Matter of Thomas & Matter of Thompson*, 27 I&N Dec. 556 (A.G. 2019).

For the reasons set forth in the accompanying opinion, I overrule the Board's decisions in *Matter of Cota-Vargas*, 23 I&N Dec. 849 (BIA 2005); *Matter of Song*, 23 I&N Dec. 173 (BIA 2001); and *Matter of Estrada*, 26 I&N Dec. 749 (BIA 2016). The tests described in those cases will no longer govern the effect of state-court orders that modify, clarify, or otherwise alter a criminal alien's sentence. Instead, for reasons similar to those explained in *Matter of Pickering*, 23 I&N Dec. 621 (BIA 2003), *rev'd on other grounds*, *Pickering v. Gonzales*, 465 F.3d 263 (6th Cir. 2006), such state-court orders will be given effect for immigration purposes only when the orders are based on a procedural or substantive defect in the underlying criminal proceeding. These state-court orders will have no effect for immigration purposes when based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or immigration hardship.

Accordingly, I vacate the decisions below and remand these cases to the Board to reassess whether the relevant state-court sentence alterations should be effective for purposes of federal immigration law.

Aliens convicted of crimes in state court may face immigration consequences based on the nature of the conviction and the length of the resulting sentence.   To avoid these consequences, some aliens seek state-court orders retroactively vacating the conviction or altering the sentence.   At present, the Board of Immigration Appeals ("Board") has adopted three different tests to determine the legal effect of such state-court orders, depending upon how the state court describes its decision.

If the order "vacates" an alien's conviction, then the order has legal effect if based on "a procedural or substantive defect in the underlying proceedings," but not if based on reasons "unrelated to the merits" such as "rehabilitation or immigration hardships." *Matter of Pickering*, 23 I&N Dec. 621, 624 (BIA 2003), *rev'd on other grounds*, *Pickering v. Gonzales*, 465 F.3d 263 (6th Cir. 2006).  If the order "modifies" an alien's sentence, then the modification is given "full . . . faith and credit" for immigration purposes regardless of the reason.  *Matter of Cota-Vargas*, 23 I&N Dec. 849, 850–52 (BIA 2005); *see also Matter of Song*, 23 I&N Dec. 173 (BIA 2001).  Finally, if the order "clarifies" an alien's sentence, then an immigration judge assessing the order's effect considers several characteristics of the order, such as whether the original sentencing order contained an obvious discrepancy and whether the clarifying court had jurisdiction to enter the order.  *Matter of Estrada*, 26 I&N Dec. 749, 755–56 (BIA 2016).  Adding to the confusion, the classification of a state-court order as a modification or clarification may turn on how the state court itself labels the order, not on any objective distinctions between the two categories.

The tests articulated in *Matter of Cota-Vargas*, *Matter of Song*, and *Matter of Estrada* have no basis in the text of the Immigration and Nationality Act ("INA"), promote inconsistency in the application of the country's immigration laws, and fail to advance Congress's intent to attach immigration consequences to certain convictions and sentences. Accordingly, those cases are overruled.  Going forward, immigration courts should apply the test articulated in *Matter of Pickering* in determining the immigration consequence of any change in a state sentence, no matter how the state court describes its order.  Such an alteration will have legal effect for immigration purposes when based on a procedural or substantive defect in the underlying criminal proceeding, but not when the change was based on reasons unrelated to the merits, such as the alien's rehabilitation or an interest in avoiding an immigration consequence.

# I.

## A.

Congress has provided that an alien's conviction for certain serious crimes, which result in a sentence of imprisonment of sufficient length, shall have consequences for an alien's immigration status. Notably, the INA defines an "aggravated felony" to include a "crime of violence" for which "the term of imprisonment [is] at least one year," *see* 8 U.S.C. § 1101(a)(43)(F), and an alien convicted of an aggravated felony is ineligible for most forms of relief or protection from removal, *see, e.g.*, *id.* § 1227(a)(2)(A)(iii). In many cases, after the Department of Homeland Security ("DHS") commences removal proceedings against a criminal alien, the alien petitions a state court to alter the conviction or resulting sentence. An alien facing removal as an aggravated felon, for example, may ask the state court to vacate the underlying conviction entirely, or to modify, clarify, or otherwise alter the associated sentence so that it falls below the one-year term of imprisonment necessary to qualify as an "aggravated felony." The state court's order may have no actual impact on the alien under state law— in most cases, the alien has already served the term of imprisonment he seeks to alter. The sole issue then is the impact that the conviction has under the immigration laws.

Under existing Board precedent, the immigration consequences of such a state-court order depend on the precise form of relief granted by the court. First, if the state court vacates the alien's conviction, then the Board applies the test set forth in *Matter of Pickering*, 23 I&N Dec. 621. In *Pickering*, the Board concluded that there is a "significant distinction" between vacaturs based on a "procedural or substantive defect in the underlying proceedings," and those based on "post-conviction events, such as rehabilitation or immigration hardships." *Id.* at 624. The former circumstance calls into question whether the *original* conviction was valid, but the latter does not. Hence, under *Pickering*, "if a court with jurisdiction vacates a conviction based on a defect in the underlying criminal proceedings, the respondent no longer has a 'conviction' as that term is defined in the INA. If, however, a court vacates a conviction for reasons unrelated to the merits of the underlying criminal proceedings, [then] the respondent remains 'convicted' for immigration purposes." *Id.*

By contrast, if the state court modifies the alien's sentence, rather than vacating the alien's conviction, then the Board follows the rule set forth in *Matter of Song*, 23 I&N Dec. at 173–74, and *Matter of Cota-Vargas*, 23 I&N Dec. at 851–52. Under those decisions, the immigration judge will

automatically give full faith and credit to the state court order, regardless of the reason for the modification. In *Matter of Song*, the respondent was originally sentenced to a term of imprisonment of one year, but subsequently petitioned a state court to resentence him to a term of imprisonment of 360 days. 23 I&N Dec. at 173–74. Finding the situation analogous to one where a state court had deemed the alien's initial sentence "to have been illegal" and thus regarding it "as void and of no force and effect," *see Matter of Martin*, 18 I&N Dec. 226, 227 (BIA 1982), the Board concluded that "the offense no longer [fell] within the definition of an 'aggravated felony' in [the INA], and the respondent [was] not removable." *Matter of Song*, 23 I&N Dec. at 174. Elaborating upon that reasoning in *Matter of Cota-Vargas*, the Board, over a dissent, held that "a modified or reduced sentence is recognized as valid for purposes of the immigration law without regard to the trial court's reasons for effecting the modification or reduction." 23 I&N Dec. at 849.

Finally, if the state court "clarifies" an alien's sentence, then the Board considers the characteristics of the order discussed in *Matter of Estrada*, 26 I&N Dec. 749. There, the respondent initially had received a twelve-month sentence, but it was not clear whether the sentence was for "probation" or for a "probated term of imprisonment"—only the latter of which would have counted as a term of imprisonment under the INA. The respondent successfully petitioned the state court to "[c]larify[]" that the sentence was solely for probation. *See id.* at 755. In deciding whether to give effect to the order, the Board considered several characteristics previously identified as relevant by the Eleventh Circuit. *See id.* (citing *Herrera v. U.S. Att'y Gen.*, 811 F.3d 1298 (11th Cir. 2016); *United States v. Garza-Mendez*, 735 F.3d 1284 (11th Cir. 2013)). These characteristics include whether the original sentencing order contained an obvious discrepancy; whether the original judge was the same as the clarifying judge; whether a significant period of time had passed between the original sentencing and the clarification; and whether the clarifying court had jurisdiction to enter the clarification. *Id.* at 755–56. The Board then observed that, in the case before it, the alien's original sentencing order was legitimately unclear and the clarifying order had been issued by the same judge who had initially sentenced the alien. *Id.* For these reasons, the Board gave effect to the order and concluded that the alien was not removable. *Id.* at 756.

Taken together, these Board decisions establish three distinct tests governing the immigration consequences of state-court orders that retroactively alter a criminal conviction or sentence. These tests are inconsistent with each other, and they cause similarly situated aliens to

experience disparate outcomes under the immigration laws.  The two cases in this matter demonstrate this inconsistency.

## B.

### 1.

In *Matter of Michael Vernon Thomas*, the respondent, a citizen of Trinidad and Tobago, had been living in the United States as a lawful permanent resident since 1977.  In 2001, a Georgia state court convicted Thomas of family violence battery, *see* Ga. Code Ann. § 16-5-23.1(f), and sentenced him to a term of imprisonment of twelve months.  In 2016, DHS charged Thomas as removable as an aggravated felon because he had been convicted of a "crime of violence" for which the "term of imprisonment [was] at least one year."  *See* 8 U.S.C. § 1101(a)(43)(F).  Thomas conceded before an immigration judge that his conviction constituted grounds for removal, and the immigration judge ordered Thomas removed.

While Thomas's appeal was pending, he petitioned a Georgia state court to alter his criminal sentence.  Thomas did not allege any procedural or substantive defect in the original criminal proceeding, which occurred over fifteen years before, but upon the consent of the prosecution, the state court issued an order stating, "Defendant's sentence in the above matter is hereby clarified to reflect that Defendant was sentenced to a cumulative term of 11 months and 28 days of probation."  The Board then remanded for the immigration judge to review the impact of the consent order.

The immigration judge declined to credit the order, and the Board affirmed.  Because the order "clarified" Thomas's sentence, the Board considered the characteristics of the order identified as relevant in *Matter of Estrada*.  The Board observed that—in contrast to the situation of the alien in that case—Thomas's original sentencing order was clear; a significant period of time (approximately fifteen years) had passed between the original sentence and the clarification; and the state-court judge clarifying the sentence differed from the original sentencing judge.  The Board thus declined to credit the "clarification" of Thomas's sentence, and he was deemed removable.

### 2.

In *Matter of Joseph Lloyd Thompson*, the respondent, a citizen of Jamaica, was lawfully admitted to the United States in 1987.  In 2012, a Georgia state court convicted Thompson of family violence battery, *see* Ga.

Code Ann. § 16-5-23.1(f), and sentenced him to a term of imprisonment of twelve months. As with Thomas, in 2017, DHS charged Thompson as removable as an aggravated felon, because had had been convicted of a "crime of violence" for which the "term of imprisonment [was] at least one year." *See* 8 U.S.C. § 1101(a)(43)(F).

In March 2018, while the removal charges were pending, Thompson filed a "Motion to Modify Sentence" in Georgia state court seeking to reduce his sentence to eleven months and twenty-seven days. Thompson did not identify any defect in the original criminal proceeding, but the court granted the motion the same day. Before the immigration judge, Thompson admitted that he had been convicted of a crime of violence, yet argued that his modified sentence did not amount to a term of imprisonment of at least one year.

After the immigration judge rejected Thompson's argument, the Board reversed on appeal. The Board acknowledged that there were questions concerning whether the Georgia state court had jurisdiction to issue the order and that the timing of the order suggested that it may have been issued to affect the immigration court proceeding. But under *Matter of Cota-Vargas*, the Board concluded that it must "give full effect" to the modified sentence. Thus, in contrast with *Matter of Thomas*, the Board gave effect to the post-sentencing state-court order and concluded that Thompson was no longer removable.

## 3.

Both Thomas and Thompson were convicted of the same state law offense, were charged with removability on the same ground, and petitioned the state courts to alter their sentences without alleging any procedural or substantive defects in the original proceeding. Yet these similarly situated aliens faced markedly divergent consequences. Relying on a semantic distinction between a "clarification" and a "modification," the Board found that Thomas *was* removable but Thompson was *not*. I certified these cases to address these inconsistencies and to clarify the appropriate treatment under the INA. *See* 27 I&N Dec. 556 (A.G. 2019).[1]

---

[1] After I certified these cases for my review, Thomas filed a "Motion for Production" asserting that the Due Process Clause entitles him to a chance to respond to any "briefing, memoranda, or other documents" that might influence the decision in his case. The motion is denied. Thomas has received DHS's briefs in these matters, and he had a full and fair opportunity to raise his own arguments and respond to any other party's arguments through his own initial and reply brief.

## II.

The INA assigns clear immigration consequences to an alien who has been convicted and sentenced for a state crime, yet the Board has adopted multiple tests that permit state courts to change those results well after the fact. Although a state court may alter a state conviction for appropriate reasons under state law, the state court does not have the authority to make immigration-law determinations. In view of these considerations, I conclude that the *Pickering* test should apply to state-court orders that modify, clarify, or otherwise alter the term of imprisonment or sentence associated with a state-court conviction. As a result, such alterations will have legal effect for immigration purposes if they are based on a procedural or substantive defect in the underlying criminal proceeding, but not if they are based on reasons unrelated to the merits, such as rehabilitation or immigration hardship. *Matter of Cota-Vargas*, *Matter of Song*, and *Matter of Estrada* must therefore be overruled.

## A.

### 1.

In considering whether a state-court order that modifies, clarifies, or otherwise alters a "term of imprisonment or a sentence" should change the immigration consequences of the original sentence, we begin with the text of the statute. *E.g.*, *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The INA defines "conviction" and a "term of imprisonment or a sentence" as follows:

> (A) The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—
>
> > (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
> >
> > (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.
>
> (B) Any reference to a *term of imprisonment or a sentence* with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of

the imposition or execution of that imprisonment or sentence in whole or in part.

8 U.S.C. § 1101(a)(48) (emphasis added). An alien plainly has been convicted under the INA when a court has entered "a formal judgment of guilt," and he has received a sentence when the court orders a "period of incarceration or confinement," no matter whether that sentence is executed.

The question then is whether the state court's subsequent alteration of a "conviction" or a "sentence" changes those facts under the INA. Neither the INA nor the associated regulations provide further guidance on this point, but the statute's history helps illuminate the meaning of the phrase. Congress amended the INA to define "conviction" following the Board's decision in *Matter of Ozkok*, 19 I&N Dec. 546 (BIA 1988). There, the Board established a rule that "a conviction will be found for immigration purposes" where:

(1) a judge or jury has found the alien guilty or he has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilty;

(2) the judge has ordered some form of punishment, penalty, or restraint on the person's liberty to be imposed (including but not limited to incarceration, probation, a fine or restitution, or community-based sanctions such as a rehabilitation program, a work-release or study- release program, revocation or suspension of a driver's license, deprivation of nonessential activities or privileges, or community service); and

(3) a judgment or adjudication of guilt may be entered if the person violates the terms of his probation or fails to comply with the requirements of the court's order, without availability of further proceedings regarding the person's guilt or innocence of the original charge.

*Id.* at 551–52. Under *Ozkok*'s definition of "conviction," "it was possible for a defendant to plead nolo contendere, obtain a suspended sentence, or enter a rehabilitation program on probation—so long as the court stopped short of a formal adjudication of guilt—without having the offense be considered a conviction for purposes of immigration laws." *Francis v. Gonzales*, 442 F.3d 131, 140 (2d Cir. 2006). Applying this definition "required an individualized analysis of the particular procedures of different state penal systems to determine whether a person had been 'convicted.'" *Id.*

Congress rejected the third element of *Ozkok* in enacting 8 U.S.C. § 1101(a)(48) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). The statute incorporated the first two elements of *Ozkok*'s definition of "conviction," but eliminated the third, which had excluded certain suspended sentences. *See* Pub. L. No. 104-208, div. C, § 322, 110 Stat. 3009, 3009-546, 3009-628 (1996); *see also* H.R. Rep. No. 104-828, at 224 (Conf. Rep. 1996) (confirming this textual interpretation by observing that the IIRIRA "broaden[ed] the scope of the definition of 'conviction' beyond that adopted by the Board of Immigration Appeals in *Matter of Ozkok*," which had not gone "far enough to address situations where a judgment of guilt or imposition of sentence [was] suspended."); *Francis*, 442 F.3d at 141 (collecting cases acknowledging "that in enacting IIRIRA, Congress specifically and deliberately abrogated the *Ozkok* test").

In enacting section 1101(a)(48), Congress made clear that immigration consequences should flow from the original determination of guilt. In addition, Congress ensured uniformity in the immigration laws by avoiding the need for immigration judges to examine the post-conviction procedures of each State. *See Saleh v. Gonzales*, 495 F.3d 17, 23 (2d Cir. 2007) ("Interpreting the new definition, the BIA identified two primary aims that it believed Congress sought to accomplish: to focus the conviction inquiry on the 'original determination of guilt' and to 'implement a uniform federal approach.'" (quoting *Matter of Roldan–Santoyo*, 22 I&N Dec. 512, 521–22 (BIA 1999)); *Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 306 (1st Cir. 2000) (explaining the "emphasis that Congress placed on the *original* admission of guilt" when enacting the new definition of "conviction" (emphasis in original)); *id.* at 305 (explaining that *Matter of Ozkok* "failed to produce . . . uniformity and Congress stepped in to fill the void"); *see also, e.g.*, *Resendiz-Alcaraz v. U.S. Atty. Gen.*, 383 F.3d 1262, 1270 (11th Cir. 2004).

This statutory history confirms that, under paragraph (A), an alien's *original* adjudication or admission of guilt establishes the fact of his "conviction." The remainder of the definition, paragraph (B), similarly contains language making clear that the length of a "term of imprisonment or a sentence" is calculated "*regardless of any suspension of the imposition or execution of that imprisonment or sentence* in whole or in part." 8 U.S.C. § 1101(a)(48)(B) (emphasis added). The length of a sentence for immigration purposes thus ignores "suspensions" (whether occurring at the time of sentencing or thereafter), suggesting that other post-sentencing events—such as modifications or clarifications—should not be relevant under the immigration laws. Accordingly, the phrase "term of imprisonment or a sentence" in paragraph (B) is best read to concern an alien's *original*

criminal sentence, without regard to post-sentencing alterations that, like a suspension, merely alleviate the impact of that sentence.

This reasoning, which supports the *Pickering* test, should likewise extend to all state-court modifications, clarifications, and other alterations of a criminal sentence. If the original sentence was altered because of a legal defect, then the sentence was not legally effective, and there is no valid sentence to which immigration consequences can attach. The original sentence—because of the defect—should not have been entered in the first place. If, in contrast, a state court later alters an earlier sentence for rehabilitative or immigration reasons, then the immigration consequences of that sentence under section 1101(a)(48) remain unchanged because section 1101(a)(48) addresses the alien's original term of imprisonment or sentence. *See Saleh*, 495 F.3d at 24 (explaining that "Congress did not intend to allow an alien to escape [immigration] consequences by means of a state vacatur that was not on the merits").

Said differently, Congress has determined that an alien who is convicted of a crime that is sufficiently serious to warrant a significant sentence should be subject to removal. Later alterations to that sentence that do not correct legal defects, do not change the underlying gravity of the alien's action. They accordingly do not affect Congress's judgment as to whether that alien should be removed. Such an alteration therefore should have no effect for purposes of the immigration laws. *Cf. id. at* 25 ("When a conviction is amended nunc pro tunc solely to enable a defendant to avoid immigration consequences, in contrast to an amendment or vacatur on the merits, there is no reason to conclude that the alien is any less suitable for removal."). Applying the *Pickering* test to all sentence alterations thus ensures that aliens who have committed significant crimes, as identified by Congress, do not later avoid the immigration consequences of those actions.

Furthermore, the application of a single test to state-court sentence alterations promotes uniformity in the law. In the cases currently under review, for example, applying the *Pickering* test should avoid the inconsistent results that apply to the two similarly situated respondents. If neither state court altered the respondent's sentence on the basis of "a procedural or substantive defect in the underlying proceedings," *see Pickering*, 23 I&N Dec. at 624, then the *Pickering* test would dictate the same immigration consequence for both respondents.

In addition, applying the *Pickering* test to all forms of state-court sentence alterations resolves inconsistencies among the states' "crazy quilt of . . . widely disparate state rehabilitative and diversionary arrangements." *Herrera-Inirio*, 208 F.3d at 305; *see also, e.g.*, *Pinho v. Gonzales*, 432 F.3d 193, 205 (3d Cir. 2005) (observing that the Board in the past has been

"bedeviled by the diversity of state rehabilitative programs and the resulting difficulty in fashioning a uniform national immigration policy"); *Resendiz-Alcaraz*, 383 F.3d at 1269 (noting "the vagaries of state law" related to the alteration of a conviction). The *Pickering* test eliminates the need to assess this broad array of state procedures. If the state court alters the alien's sentence because of a procedural or substantive defect in the original proceeding, then the alteration has legal effect—regardless of the label the state court placed on the order. If the state court alters an alien's sentence on the basis of something other than a procedural or substantive defect, then the alteration has no effect and the immigration judge need inquire no further. Moreover, similarly situated aliens in different states will face similar consequences. Whether one state affords more or less generous mechanisms for altering a sentence for rehabilitative purposes will be irrelevant. Only those alterations based on legal defects will receive effect. The country's immigration system will thereby achieve more uniform results.

**2.**

In reaching this conclusion, I have considered the Board's reasons for adopting the *Cota-Vargas* and *Estrada* tests, but I find them unpersuasive. In *Matter of Song*, the Board offered little analysis before giving full effect to state-court modifications, and it did not ground that rule in any facet of the text of the INA. *See* 23 I&N Dec. 173. In *Matter of Cota-Vargas*, the Board acknowledged that the "language and purpose of section 101(a)(48)(A)" support applying the *Pickering* rule to sentence alterations, *see* 23 I&N Dec. at 852, but found it relevant that paragraph (B) addresses "suspensions" and not "modifications." Based upon this statutory silence, the Board inferred a congressional intent to credit state-court modifications that were unrelated to the merits of a criminal proceeding. *See id.* Yet paragraph (A)'s definition of "conviction" is equally silent about "vacaturs," and the Board nonetheless determined in *Matter of Pickering* that vacaturs unrelated to the merits will not have immigration consequences. *See* 23 I&N Dec. at 624. Paragraph (A) and paragraph (B) simply do not address vacaturs, modifications, or clarifications. This silence, however, provides no reason to depart from Congress's focus on the alien's original conviction and sentence in either of those provisions.

I likewise do not believe that the *Estrada* test finds any more support in the INA. There, the Board considered a number of characteristics in assessing the effect of a clarification, yet none of them flows directly from the text of the INA itself, *see* 26 I&N Dec. 755–56, and reliance on such

varied considerations does not promote uniformity, *cf. Hertz Corp. v. Friend*, 559 U.S. 77, 91–92 (2010) (observing that "highly general multifactor tests . . . [had] failed to achieve a nationally uniform interpretation of federal law"). Moreover, the *Estrada* test may give effect to state-court clarifications that do not call into question the validity of a criminal alien's original sentence. For example, the opinion in *Estrada* suggests that a "clarification" entered shortly after the original sentence by the same judge who issued the sentence could be given effect for immigration purposes, *see* 26 I&N Dec. 755–56, even if the alien who sought the clarification did so just to avoid immigration consequences. The *Estrada* test thus undermines Congress's decision to attach immigration consequences to sentences of a certain length.

## B.

In extending the *Pickering* test to all forms of sentence alterations, I have also considered and rejected several additional arguments pressed by the respondents.

## 1.

The respondents first argue that requiring immigration judges to assess the reasons that a state court altered a criminal alien's sentence would require them to act as fact-finders in matters of state criminal law with which they have little familiarity. The *Pickering* test, however, already requires immigration judges to assess the administrative record and make determinations about the reasons that certain state-court orders were entered. *See* 23 I&N Dec. at 625 (examining "the law under which the [post-conviction] court issued its order," "the terms of the order itself," and "the reasons presented by the respondent in requesting that the court vacate the conviction"). The extension of the *Pickering* test to state-court sentence alterations raises no new concerns about the role of immigration judges in assessing the record.

Moreover, the evidence on which immigration judges will rely when assessing state-court sentence alterations will typically be readily available in the record and should require little interpretation of state law. The application of the *Pickering* test demonstrates as much, as adjudicators applying it frequently determine whether a vacatur is valid for immigration purposes by assessing the text of the order of vacatur itself or the alien's motion requesting the vacatur. *See, e.g.*, *Al-Najar v. Mukasey*, 515 F.3d 708, 716 (6th Cir. 2008) (declining to give effect to a vacatur because of "the absence of any substantive legal basis cited in [the alien's] motion"); *Sanusi*

*v. Gonzales*, 474 F.3d 341, 347 (6th Cir. 2007) (declining to give effect to a vacatur because "[a] colorable legal ground for the granting of a writ of *coram nobis* was not raised in [the alien's] state court petition"); *Alim v. Gonzales*, 446 F.3d 1239, 1251 (11th Cir. 2006) (giving effect to a vacatur after examining the "state court order" and the alien's "coram nobis petition" to determine "the reason underlying the state court's decision to vacate" the conviction).   The availability of such evidence thus indicates that immigration judges should not need to wade into the intricacies of state criminal law in applying this opinion's rule.

## 2.

The respondents next contend that the Full Faith and Credit Act, 28 U.S.C. § 1738 (the "Act"), requires that immigration judges and the Board give effect to state-court alterations of a criminal sentence, regardless of the reasons for that alteration.   The respondents contend that *Matter of Cota-Vargas* supports this argument because, although that decision did not cite the Act, it concluded that a state court's "decision to modify or reduce an alien's criminal sentence nunc pro tunc is entitled *to full faith and credit* by the Immigration Judges and the Board of Immigration Appeals."   23 I&N Dec. at 849 (emphasis added).   This argument fails for two independent reasons.

First, Congress may define terms such as "conviction" for the purposes of federal law in a way that differs from the definition attached to such terms by state courts.   Thus, in deciding whether a vacated conviction remains effective for immigration purposes, an immigration judge or the Board merely applies and upholds the definition of conviction in the INA.   The adjudicator is not reevaluating or otherwise questioning the validity of the state-court judgment.   The adjudicator accordingly does not violate the Full Faith and Credit Act.   *See Saleh*, 495 F.3d at 26 ("[T]he BIA is simply interpreting how to apply Saleh's vacated State conviction for receiving stolen property to the INA and is not refusing to recognize or relitigating the validity of Saleh's California state conviction.   The full faith and credit statute is not thereby violated."); *Herrera-Inirio*, 208 F.3d at 307 ("Neither the Full Faith and Credit Clause nor the statutory overlay 'purports to prevent federal legislative authorities from writing federal statutes that differ from state statutes or from attaching, to words in a federal statute, a meaning that differs from the meaning attached to the same word when used in a statute enacted by a state.'" (quoting *Molina v. INS*, 981 F.2d 14, 19 (1st Cir. 1992) (Breyer, J.))).

The same reasoning applies to sentence alterations.  In applying the *Pickering* test to these state-court orders, the immigration judge is simply determining the meaning of the phrase "term of imprisonment or a sentence" in the INA for the purpose of enforcing federal immigration law.  Hence, for the same reason that interpreting the term "conviction" in accordance with the *Pickering* test "does not infract applicable principles of full faith and credit," *see Herrera-Inirio*, 208 at 307, applying the *Pickering* test to the phrase "term of imprisonment or a sentence" likewise does not implicate, much less violate, the Full Faith and Credit Act.

The respondents attempt to avoid this result on the ground that *Matter of Pickering's* interpretation of "conviction" is required by paragraph (A) of 8 U.S.C. § 1101(a)(48), whereas paragraph (B) does not mandate a similar result for the phrase "term of imprisonment or a sentence."  As discussed above, however, I believe that the text and history of this provision suggest that the two paragraphs are properly construed together, such that paragraph (A)'s focus on the original criminal proceeding requires paragraph (B) to be similarly interpreted.  Moreover, just as paragraph (B) does not specifically address the effect of state-court "modifications," "clarifications," or other alterations of a sentence, paragraph (A) does not specifically address the effect of state-court "vacaturs" of a conviction.  Both paragraphs, in other words, are silent on the effect of state-court orders, so there is no express textual basis for differentiating between the paragraphs in deciding whether to apply the Full Faith and Credit Act.

The respondents' argument also fails for the second reason that the Full Faith and Credit Act does not apply to federal agencies.  By its own terms, that statute provides that "[a]cts, records and judicial proceedings . . . shall have the same full faith and credit *in every court* within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."  28 U.S.C. § 1738 (emphasis added).  The text of the Act is thus clear:  it applies to "courts"—but not to "agencies"—and does not require agency officials such as immigration judges or the Board to give effect to state-court orders.  *See Perez v. Cissna*, 914 F.3d 846, 857 (4th Cir. 2019) ("[T]he Act does not apply to agencies.  The text of the Act is clear. . . . The [United States Citizenship and Immigration Services ("USCIS")] is not a court.  Thus, the plain language of 28 U.S.C. § 1738 establishes that it does not apply to [USCIS]."); *see also Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 799 (5th Cir. 2000) (explaining that the "plain language of [the Act] establishes that it does not apply" to an agency); *N.L.R.B. v. Yellow Freight Sys., Inc.*, 930 F.2d 316,

320 (3d Cir. 1991) (holding that "federal administrative agencies are not bound by section 1738 because they are not 'courts'").[2]

The foregoing observations also dispose of the respondents' broader argument that—even apart from the Act—an immigration judge's assessment of state-court sentence alterations would contravene principles of federalism and comity. Contrary to respondent Thompson's argument, an immigration judge's evaluation of the reasoning behind a state-court alteration of an alien's sentence does not "arrogate" to the federal government "the power to determine the effectiveness of state court orders." Instead, as explained above, the immigration judge in such a case simply determines the effect of that order for the purposes of federal immigration law. *See Matter of Velasquez-Rios*, 27 I&N Dec. 470, 474 (BIA 2018) ("We must use *Federal law*, rather than *State law*, to determine the immigration consequences of [a] respondent's . . . conviction." (emphases in original)). The state-court order itself remains effective and unchallenged for all other purposes, and there accordingly exists no intrusion on state law of the sort that principles of federalism and comity are designed to prevent.

### 3.

The respondents finally argue that, in determining the impact that a state-court alteration of a sentence should have on the immigration laws, the Attorney General should proceed through rulemaking rather than adjudication. But given that the Board itself adopted its prior tests precisely in the context of administrative adjudications, I do not believe that there is a need for a regulation here. Indeed, Supreme Court precedent confirms my authority as agency head to proceed by adjudication, and my authority here derives from the text of the relevant provisions in the INA.

The Supreme Court has long recognized that agencies may decide whether to announce reinterpretations of a statute through rulemaking or through adjudication. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first

---

[2] Two Board opinions suggest that 28 U.S.C. § 1738 nonetheless applies to federal agencies. *See Matter of Adamiak*, 23 I&N Dec. 878, 880 (BIA 2006) ("In the absence of a statutory directive to the contrary, we are required by 28 U.S.C. § 1738 (2000) to give full faith and credit to this State court judgment."); *Matter of Rodriguez-Ruiz*, 22 I&N Dec. 1378, 1380 (BIA 2000) ("We will instead accord full faith and credit to this state court judgment. See 28 U.S.C. § 1738."). The plain text of the statute and the federal court precedent cited above indicate that these cases were wrongly decided. These cases accordingly are overruled to the extent that they suggest that the Full Faith and Credit Act applies to proceedings before immigration judges and the Board.

instance within the [agency's] discretion."); *see also Velasco-Giron v. Holder*, 773 F.3d 774, 779 (7th Cir. 2014) (explaining that agencies "can choose freely between rules and standards, between rulemaking and adjudication"); *Gao v. Holder*, 595 F.3d 549, 556 (4th Cir. 2010) ("[I]t is a basic principle of administrative law that 'the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.'" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). Indeed, in the decades since *Bell Aerospace*, the Supreme Court "has not even *suggested* that a court can constrain an agency's choice between rulemaking and adjudication.'" *Velasco-Giron*, 773 F.3d at 779 (emphasis added) (quoting Richard J. Pierce, Jr., I Administrative Law Treatise § 6.9 at 510 (5th ed. 2010)). And agencies retain their discretion even when announcing interpretations that may conflict with prior decisions. *See Chisholm v. F.C.C.*, 538 F.2d 349, 364 (D.C. Cir. 1976) ("[A]n administrative agency is permitted to change its interpretation of a statute, especially where the prior interpretation is based on error, no matter how longstanding."); *see also id.* at 365 ("The original interpretation of the [statute] was . . . established by adjudication; thus reversal by adjudication seems particularly appropriate here."). I accordingly conclude that it is appropriate to address these Board precedents in the context of an administrative adjudication, and there is no legal requirement to do so by regulation.

## C.

Finally, although I did not request briefing on the subject, the parties to this case have addressed which side should carry the burden of proof when it comes to establishing the state court's reason for altering a sentence under the *Pickering* test. The Board and the courts of appeals have considered this issue in applying *Matter of Pickering* to vacaturs of convictions, and they have allocated the burden in different ways, depending on the procedural posture of the case at hand. *See, e.g.*, *Andrade-Zamora v. Lynch*, 814 F.3d 945, 949 (8th Cir. 2016) (the alien bears the burden to prove that a conviction was vacated because of a procedural or substantive defect when applying for cancellation of removal); *Barakat v. Holder*, 621 F.3d 398, 403–04 (6th Cir. 2010) (the government bears the burden to prove that a conviction was vacated for reasons *other* than a procedural or substantive defect when seeking to establish that an alien is removable); *Rumierz v. Gonzales*, 456 F.3d 31, 37 (1st Cir. 2006) (the alien bears the burden to prove that a conviction was vacated because of a procedural or substantive defect when seeking to reopen removal proceedings).

The courts of appeals have sometimes invoked a burden-shifting framework to describe the burden of proof, *e.g.*, *Barakat*, 621 F.3d at 403 (describing how "the burden of production may shift during removal proceedings"), but regardless of how the issue is described, the bottom line remains the same:  When the government alleges that an alien is deportable, the government bears the burden of proving deportability by clear and convincing evidence.  8 U.S.C. § 1229a(c)(3)(A).  And when an alien applies for relief from removal, the alien bears the burden to prove that he meets the eligibility requirements for the specific form of relief requested.  *Id.* § 1229a(c)(4).  After all of the evidence has been proffered by the parties, the immigration judge must weigh that evidence and determine whether the party bearing the burden of proof has carried its burden.

The parties to this appeal dispute how these principles should apply in the context of sentence alterations, but I did not request briefing on this issue.  *See* 27 I&N Dec. 556.  In the absence of such a request, I decline to address the burden-shifting issue anew and thus leave undisturbed the existing body of law applying the *Pickering* test.

## III.

For the reasons explained, the Board's decisions in *Matter of Cota-Vargas*, *Matter of Song*, and *Matter of Estrada* are overruled.  The tests described in those cases will no longer govern the immigration-related effects of state-court orders that modify, clarify, or otherwise alter a criminal alien's sentence.  Instead, such state-court orders will be given effect for immigration purposes only if based on a procedural or substantive defect in the underlying criminal proceeding.  These orders will have no effect for immigration purposes if based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or the avoidance of immigration consequences.

Because the Board's decisions in *Matter of Michael Vernon Thomas* and *Matter of Joseph Lloyd Thompson* were based on these earlier precedents, I vacate the Board's decisions below and remand these cases to the Board to assess the state-court alterations in light of the *Pickering* test.  I do not doubt that it would be the rare case where a state court's alteration of an old sentence by three or four days (as in respondents' cases) would reflect a necessary remedy for a fundamental legal defect, rather than an exercise of the trial judge's sentencing discretion.  But insofar as the parties litigated these cases under the earlier precedents, I do not wish to foreclose any available arguments in that regard.  On remand, the Board may review the evidence in the record, and consider any appropriate requests to reopen the

record, to determine whether the state-court alterations in each of these cases arose as a result of a procedural or substantive defect, or for some other reason.